# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LAWRENCE A. TAPIA,

    Plaintiff,

vs.                                          CIV. No. 97-1463 BB/RLP

SOUTHERN PACIFIC TRANSPORTATION,
INC., and UNION PACIFIC RAILROAD COMPANY,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court for consideration of Defendants' Renewed Motion for Evidentiary Hearing and for Summary Judgment (Doc. 50). Having considered the submissions of the parties and the applicable law, the Court decides the motion will be denied.[1]

**Summary Judgment Standard**

"Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side

---

[1] The Court notes the parties have requested a hearing on the motion. However, the materials submitted by the parties are adequate to allow a decision on the motion, and a hearing is therefore not required.

or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1555 (11th Cir. 1995).

In Federal Employers' Liability Act ("FELA") cases such as this one, a somewhat different standard applies to the summary-judgment analysis. Due to the lessened burden of proof applicable to FELA plaintiffs, a plaintiff wishing to avoid summary judgment in a FELA case must present more than a scintilla of evidence, but not much more. *See Aparicio v. Norfolk & Western Ry. Co.*, 84 F.3d 803, 810 (6th Cir. 1996). The Court will consider Defendants' motion for summary judgment in light of these standards.

**Analysis**

The basis for Defendants' motion for summary judgment is their contention the testimony of both experts proffered by Plaintiff should be excluded from the trial. Without the experts' testimony, according to Defendants, Plaintiff cannot prove either causation or negligence, even slight negligence, and therefore cannot recover. *See id.* (plaintiff in FELA case must prove traditional elements of common-law negligence claim, including negligent action by defendant playing some part in causing Plaintiff's injury). The answer to Defendants' contentions is dispositive of the summary-judgment motion.

Plaintiff was employed by Defendants for a number of years as a trackman. Plaintiff developed carpal tunnel syndrome ("CTS"), the existence of which is not disputed by Defendants. Defendants do dispute, however, that the CTS was caused by Plaintiff's work. Defendants also

2

dispute Plaintiff's argument that Defendants acted negligently in failing to take steps to prevent or lessen his risk of developing CTS. To prove the causation and negligence elements of his action, Plaintiff retained two expert witnesses, Dr. Woodward and Dr. Andres. Defendants wish to exclude crucial testimony offered by each expert, arguing this Court must do so in the exercise of its function as a "gatekeeper" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under *Daubert*, this Court must determine at the outset whether an expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or decide a fact in issue. *See Summers v. Missouri Pacific R.R. System*, 132 F.3d 599, 603 (10th Cir. 1997). The scientific-knowledge prong of *Daubert* refers to reliability of the proffered testimony, and is analyzed by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. *See id.* The assist-the-trier-of-fact requirement, on the other hand, refers to the relevancy of the testimony, and is determined by ascertaining whether the expert's reasoning or methodology can be properly applied to the facts of this particular case. *See id.* With these standards in mind, the Court will examine each expert's testimony in turn.

**Dr. Woodward:** Dr. Woodward is a board-certified neurologist and clinical neurophysiologist who is trained in the art of conducting and interpreting nerve conduction test results. He was retained by Plaintiff's counsel to review the results of a large number of nerve conduction tests that had been performed on railroad employees, to provide an opinion as to whether each test revealed the presence of CTS. He concluded that 25% to 50% of the testees did not have CTS.[2] One of the tests Dr. Woodward reviewed was of Plaintiff in this case, and Dr. Woodward concluded Plaintiff does suffer from CTS in both wrists. In addition, based on a brief

---

[2]The testimony is not clear as to whether the proper figure is 25% or 50%.

history of Plaintiff's employment and possible risk factors other than work (such as diabetes or previous traumatic wrist injuries), Dr. Woodward issued an initial report concluding Plaintiff's CTS was caused by the heavy labor Plaintiff performed as a trackman.

Subsequently, Dr. Woodward was provided Plaintiff's deposition, in which Plaintiff described his work as heavy labor and testified to a lack of prior wrist injuries or diabetes. Dr. Woodward issued another report confirming his initial diagnosis of CTS, as well as his opinion the CTS was caused by Plaintiff's work rather than by some other, non-work-related causal agent. Prior to Dr. Woodward's deposition, but after his second report, he had access to a medical report prepared by another physician, confirming the presence of CTS in Plaintiff's wrists. This report also ruled out any type of "peripheral neuropathy," which was helpful to Dr. Woodward's opinion as to causation.[3] Prior to the deposition Dr. Woodward also reviewed a report prepared by Dr. Andres, the ergonomics expert retained by Plaintiff. At some point he viewed a video demonstration of the type of work performed by Plaintiff and the tools Plaintiff used in his job. Finally, Dr. Woodward testified he was personally aware of the type of work performed by railroad workers generally, from several years of living near railroad tracks and observing the workers.

The scientific literature relied on by Dr. Woodward included a report containing an extensive review of a number of epidemiological studies. The review was performed by the National Institute of Occupational Safety and Health ("NIOSH"), a division of the Centers for Disease Control. This review, titled *Musculoskeletal Disorders (MSDs) and Workplace Factors*

---

[3]The significance of the absence of peripheral neuropathy was not explored by counsel for Defendants or counsel for Plaintiff at the deposition.

4

(available on the Internet), contains a chapter specifically devoted to CTS. The NIOSH report concludes there is evidence of a positive association between forceful work and CTS, repetitive work and CTS, and vibration and CTS. The report also concludes there is strong evidence of a positive association between exposure to a combination of risk factors, such as force and repetition or force and abnormal posture, and CTS. Insufficient evidence was found linking abnormal posture alone to CTS. Based on Dr. Woodward's training, his review of the NIOSH report, and his review of other literature in the area, as well as the information specific to Plaintiff's case discussed above, Dr. Woodward plans to testify Plaintiff's CTS is work-related, rather than idiopathic[4] as Defendants contend. It is this testimony Defendants wish to exclude.

Dr. Woodward's planned testimony may be broken down for purposes of analysis into three main components: (a) Plaintiff has CTS; (b) Heavy labor with one's hands is a risk factor for CTS; and (c) Plaintiff was sufficiently exposed to this risk factor, has no past or present history of non-work-related risk factors, and therefore has CTS caused by his work rather than some other factor. As noted above, Defendants do not dispute the first component, the fact Plaintiff suffers from CTS in both wrists. In addition, Defendants do not seriously dispute the

---

[4]In general, the term "idiopathic," as the Court understands it, means arising naturally from the passage of time or without apparent cause, rather than from some particular activity.

5

second component, although they do not concede the point.[5] Defendants do, however, vigorously dispute the third component.

Defendants' main contention is Dr. Woodward had inadequate information concerning Plaintiff's particularized, individual circumstances. This argument specifies two areas in which Dr. Woodward's knowledge was allegedly lacking – first, he had insufficient information about the nature of Plaintiff's job, including information such as the number of hours in a day Plaintiff used a particular tool, the number of rest breaks he was afforded, and other details of his work. Second, Dr. Woodward had no technical, quantified information concerning the amount of force or repetition involved in Plaintiff's job, and could provide no numbers detailing certain levels of either force or repetition that could cause CTS.

As to the first area, Defendants erroneously focus solely on Dr. Woodward's initial opinion. They disparage that opinion, pointing out it was rendered on the basis of a questionnaire filled out by employees of Plaintiff's attorney, and argue the questionnaire was entirely insufficient to provide Dr. Woodward enough information to make an informed decision as to causation. As pointed out above, however, since Dr. Woodward prepared his initial report concerning Plaintiff, he has been provided with a substantial amount of information which, in his mind, has only confirmed his initial impression. Including the questionnaire, which contained information about

---

[5]Even if Defendants did dispute there is a causal association between heavy labor and CTS, the Court finds there is sufficient scientific evidence of such an association to allow testimony on the subject. Although the point is not without dispute, a significant number of scientifically-conducted epidemiological studies, as discussed in the NIOSH article cited above, have determined a causal association exists between forceful, repetitive labor and CTS. Under *Daubert*, the Court may not question the conclusion drawn from these studies, only the methodology used in them. *See Summers*, 132 F.3d at 603, fn. 4. Defendants have not challenged the NIOSH document's contents or conclusions, or the methodology of any of the studies discussed in that document.

the tools Plaintiff used, a description of his job, and medical-history information, Dr. Woodward has had access to information from Plaintiff's deposition, an ergonomist's report, a videotaped re-enactment of Plaintiff's job, and more detailed information about the tools Plaintiff used. Thus, even if Dr. Woodward's initial impressions were based on insufficient information, a point the Court does not decide, he has had ample opportunity to flesh out his knowledge of the requirements of Plaintiff's position and to change, refine, or reconfirm his initial opinion. While it may be a proper basis for cross-examination, the fact he did not personally observe Plaintiff performing his job does not disqualify the doctor from offering an opinion on the basis of the information he was provided.

Defendants' second attack on Dr. Woodward's opinion is more problematic. Defendants point out Dr. Woodward does not know how much force, in pounds or kilograms or any quantitative measure, was involved in the various tasks Plaintiff performed, and could not tell at what point the force used in a job becomes excessive. Dr. Woodward described Plaintiff's work as heavy labor, involving forceful and repetitive use of his hands. He could not, however, provide specific numerical baselines for these terms, such as number of repetitions per minute. In other words, as Defendants argue, his opinions of the requirements of Plaintiff's job and of the causation levels for CTS were qualitative rather than quantitative. In part, however, this is because no such quantitative standards appear to exist. The Court has been directed to no studies establishing a minimum amount of force required to reach the causation threshold of CTS, or the minimum number of repetitions per minute to reach the same threshold. Similarly, no vibration levels have been scientifically established above which CTS is likely to appear. The NIOSH study does not specify what it means by "force" or "repetition" or "vibration." Accordingly, it is

unreasonable to expect an expert to be able to provide such figures. In addition, where there are numerous studies establishing a causative link between heavy manual labor and CTS, and Plaintiff appears to have performed heavy manual labor,[6] it seems overly technical to exclude an expert's testimony because of the lack of specificity as to what "heavy manual labor" might mean. This is an appropriate question for cross-examination and argument to the jury, rather than an issue mandating exclusion of Dr. Woodward's opinion.

Based on the NIOSH review, the question of CTS causation does not appear to be an area of medicine or science that, at present, is specifically quantified. However, Dr. Woodward's causation opinion is sufficiently based on current scientific knowledge, as well as knowledge concerning Plaintiff's specific situation, to be reliable and relevant. Therefore, his opinion as to causation will not be excluded.[7]

**Dr. Andres:** Dr. Andres is an ergonomist with a doctorate in bioengineering. He issued a report concerning the foreseeability, to Defendants, that Plaintiff would develop CTS as a result of his work. Dr. Andres concluded Plaintiff was exposed to a number of risk factors for CTS on the job. He also concluded Defendants were aware of the risks posed by Plaintiff's employment, and were negligent in failing to take steps to reduce or eliminate those risks. Defendants seek to exclude Dr. Andres' opinions.

---

[6] At minimum, there is a genuine issue of material fact as to that question.

[7] The Court notes that even if Dr. Woodward were precluded from testifying as to his ultimate causation opinion, he would be allowed to testify that Plaintiff has CTS and was exposed to risk factors for CTS. This testimony, combined with Dr. Andres' report and Plaintiff's testimony, would be sufficient to raise a genuine issue of material fact on the causation question. *See Aparicio*, 84 F.3d at 812-13 (given relaxed standard of causation applied in FELA cases, jury issue was raised by employees' testimony concerning exposure to CTS risk factors on job, and medical testimony that exposure to risk factors increased likelihood of developing CTS).

Dr. Andres reviewed extensive information in arriving at his opinions. This information included a medical report concluding Plaintiff has CTS in both wrists, the NIOSH article as well as other literature concerning CTS, a summary of Plaintiff's job tasks and tools, Association of American Railroads ("AAR") documents, his previous personal observations of trackmen at work, Plaintiff's deposition, a site inspection of Plaintiff's workplace, Defendants' operating manual, a deposition of Defendants' ergonomist and of Defendants' medical director, and a demonstration of the job tasks Plaintiff was required to perform. Without going into detail, it suffices to say this information tended to establish Defendants were exposed to information as early as 1985 concerning increasing complaints of CTS among trackmen, as well as possible causes of the syndrome; Defendants ignored the possible risks and failed to perform any ergonomic analyses of any of their jobs; Defendants' experts continue to deny the possibility that any of their work functions could cause CTS; Plaintiff was exposed to risk factors for CTS while working at his job; and Defendants took no steps to warn Plaintiff of the first symptoms of CTS, to educate him as to possible prevention techniques, or to otherwise prevent or lessen the impact of Plaintiff's CTS.

Defendants maintain Dr. Andres' proposed opinions should be excluded for the same reasons they attack Dr. Woodward's -- Dr. Andres, like Dr. Woodward, could not quantify the amount of force necessary to reach a causation level for CTS, and did not measure the exact amount of force used by Plaintiff in his job tasks. For the same reasons discussed above with respect to Dr. Woodward, the Court disagrees with Defendants' position. An experienced ergonomist such as Dr. Andres has sufficient knowledge of the forces involved in using the tools Plaintiff used, and performing the tasks he performed, to be able to compare the force, repetition,

and vibration to which Plaintiff was exposed with the factors involved in the various occupations previously studied by other scientists.

The Court also notes the Sixth Circuit has impliedly approved of the use of similar testimony by Dr. Andres, in the *Aparicio* case cited above. In that case, the Sixth Circuit reversed the district court's determination that Dr. Andres' testimony concerning ergonomic risk factors for CTS and the defendant's knowledge of those risk factors was insufficient to overcome the defendant's motion for summary judgment. The appellate court determined this testimony constituted "more than a scintilla" of evidence as to the defendant's negligence. 84 F.3d at 811-12. Similarly, in this case, Dr. Andres' testimony is sufficient to raise a jury issue on that question. He had ample information about Plaintiff's particular job, the forces involved in that job, Defendants' knowledge of the risk factors contributing to the causation of CTS, and the scientific literature in the area, to be able to offer the opinions he has stated in his report. Therefore, the Court will not exclude his testimony.

**Contrary Case Law:** Defendants cite federal district court cases from other jurisdictions that have rejected testimony from ergonomists or physicians in CTS cases. These cases, however, are distinguishable. For example, in *Dukes v. Illinois Cent. R.R. Co.*, 934 F.Supp. 939, 949-50 (N.D.Ill. 1996), the expert had not reviewed any research in the CTS area before reaching his conclusions. He also had no knowledge of the manner in which the plaintiff performed his job. In this case, however, as discussed above, both Dr. Woodward and Dr. Andres had reviewed the available literature in the area and had extensive information about the tasks, tools, and effort involved in Plaintiff's job. Similarly, in *Magdaleno v. Burlington Northern R.R. Co.*, 5 F.Supp.2d 899, 904-05 (D.Colo. 1998), the expert ergonomist had not made any attempt to rule out or

consider nonoccupational risk factors for CTS, and apparently had no information directly from the plaintiff concerning the manner in which the plaintiff performed his job. [8] Finally, in *Williams v. Burlington Northern and Santa Fe Ry.*, 13 F.Supp.2d 1125, 1130-31 (D.Kan. 1998), the proffered expert had no information concerning nonoccupational risk factors such as previous wrist trauma, had no information concerning the possible existence of ergonomic hazards in the plaintiff's job, and provided no information as to how and when the defendant should have become aware of the plaintiff's exposure to occupational risk factors. The differences between the experts' knowledge in these cases and that of Drs. Woodward and Andres are obvious.

**Conclusion**

The Court's decision may be summed up as follows. Both Dr. Woodward and Dr. Andres had much more information concerning the specific tasks, tools, and manner of performance of Plaintiff's job than Defendants give them credit for. In addition, both are familiar with the literature in the area of occupational causation of CTS. Finally, their failure to take specific measurements of the force required in different tasks performed by Plaintiff is not fatal to their testimony, because the possible risk factors involved in his job are obvious. Either his work involved a significant amount of repetition or it did not; that is a factual issue to be addressed at

---

[8] Furthermore, the Court disagrees with the *Magdaleno* court's apparent requirement that an expert perform a complete epidemiologic study of a particular workplace before offering an opinion as to CTS causation. 5 F.Supp.2d at 905. This requirement is contrary to the holding in *Aparicio* and appears unworkable in practice. It would require a complete study of the incidence of CTS in the particular workplace and a comparison of the risk factors involved in different occupations present at that workplace. *See* NIOSH article, detailing methodology used in CTS studies. Setting aside the fact the employer and other employees may not wish to participate in such a task, it is an unreasonable burden to place upon a plaintiff. The Court is aware of no reason an epidemiologic study must be performed in every case involving a different workplace and CTS. Instead, an expert should be allowed to extrapolate from the studies that have been performed on other workplaces.

trial. Either the use of heavy tools such as sledge hammers or spiking mauls was a frequent occurrence in his job or it was not; again, that is a factual issue for trial. The point of *Daubert* was to ensure that "junk science" is kept out of trials,[9] and the Court is convinced neither Dr. Woodward nor Dr. Andres is engaged in "junk science." Finally, given the lesser evidentiary burden facing FELA plaintiffs than other plaintiffs, summary judgment in this case is inappropriate at this time. Therefore, the motion will be denied.

## ORDER

Based on the foregoing, Defendants' motion for summary judgment (Doc. 50) is hereby DENIED, and the case will proceed to trial.

DATED September 3d, 1999.

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE

---

[9]*Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1994).

**Attorneys:**

**For Plaintiff**
Shawn M. Sassaman
Cappelli & Associates
794 Penllyn Pike
Blue Bell, Pennsylvania 19422

**For Defendants**
John S. Thal
Atkinson & Thal, P.C.
201 Third Street N.W.
Suite 1850
Albuquerque, New Mexico 87102

Andrew W. Reinhart
Sinclair Jackson Reinhart & Hayden
Southpointe Plaza I
400 Southpointe Blvd., Suite 120
Canonsburg, Pennsylvania 15317